NLRB v. Consolidated Bus Transit, Inc.

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term, 2008

(Argued: December 16, 2008                           Decided: August 20, 2009)

Docket Nos. 08-0856-ag (Lead), 08-1094-ag (XAP)

————————————————————————

NATIONAL LABOR RELATIONS BOARD,

*Petitioner-Cross-Respondent*,

– v. –

CONSOLIDATED BUS TRANSIT, INC.,

*Respondent-Cross-Petitioner*,

LOCAL 854, INTERNATIONAL BROTHERHOOD OF TEAMSTERS,

*Respondent*.

————————————————————————

Before POOLER and KATZMANN, *Circuit Judges*.[*]

————————————————————————

Petitioner National Labor Relations Board ("Board") petitions for enforcement of its August 31, 2007 Decision and Order ("Order") finding Respondent Consolidated Bus Transit, Inc. ("CBT") to have committed various unfair labor practices in violation of the National Labor Relations Act ("Act"), 29 U.S.C. § 151 *et seq.* CBT cross-petitions for review of the Order and contends that the Board wrongly concluded that the company discharged employee Juan Carlos Rodriguez, in violation of sections 8(a)(1) and (3) of the Act. CBT asserts also that, even if Rodriguez was discharged, the Act's policies and Board and Circuit precedent preclude the award of back pay as a remedy because Rodriguez was unlicensed to drive a school bus during the back pay period. We disagree, enforce the Order in full, and deny the cross-petition for review.

---

[*] The Honorable Sonia Sotomayor, originally a member of the panel, was elevated to the Supreme Court on August 8, 2009. The two remaining members of the panel, who are in agreement, have determined the matter. *See* 28 U.S.C. § 46(b); Local Rule 0.14(2); *United States v. Desimone*, 140 F.3d 457 (2d Cir. 1998).

JOAN E. HOYTE, Attorney (Ronald Meisburg, General Counsel, John E. Higgins, Jr., Deputy General Counsel, John H. Ferguson, Associate General Counsel, Linda Dreeben, Deputy Associate General Counsel, and Fred B. Jacob, Supervisory Attorney, *on the brief*), Washington, D.C., *for Petitioner-Cross-Respondent*.

MICHAEL J. MAURO (Richard I. Milman, *on the brief*), Milman Labuda Law Group PLLC, Lake Success, N.Y., *for Respondent-Cross-Petitioner*.

PER CURIAM:

Petitioner-Cross-Respondent National Labor Relations Board ("Board") petitions this Court for enforcement of its August 31, 2007 Decision and Order ("Order") finding Respondent-Cross-Petitioner Consolidated Bus Transit, Inc. ("CBT") to have committed various unfair labor practices in violation of the National Labor Relations Act ("Act"), 29 U.S.C. § 151 *et seq.* CBT cross-petitions for review of the Order, contending that substantial evidence does not support the Board's finding that CBT discharged, instead of temporarily disqualified, employee Juan Carlos Rodriguez from employment as a school bus driver, in violation of sections 8(a)(1) and (3) of the Act, 29 U.S.C. § 158(a)(1), (3). CBT asserts also that the Act's remedial policies, this Circuit's decision in *NLRB v. Future Ambulette, Inc.*, 903 F.2d 140 (2d Cir. 1990), and the Board's decision in *Anheuser-Busch, Inc.*, 351 N.L.R.B. No. 40 (Sept. 29, 2007), preclude imposition of a back pay remedy as Rodriguez was not licensed to drive a school bus during the period covered by the back pay award.

Because we defer to the Board's discretion under its own rules and regulations to credit CBT's admission, through its answer, that the company discharged Rodriguez, and because we find that (1) the Act's remedial policies are not contravened by the back pay award in the

2

circumstances of this case, and (2) *Future Ambulette* and *Anheuser-Busch* do not compel a contrary result, we deny CBT's petition for review and grant the Board's application for enforcement of its Order in full.

## BACKGROUND

**A.    Facts**

1.      Consolidated Bus Transit, Inc. and the 19A Test

CBT provides bus transportation services to the New York City Department of Education and to private schools throughout the New York City area.  CBT's approximately 2000 bus drivers and escorts are represented by two different unions, Local 854, International Brotherhood of Teamsters, AFL-CIO ("Local 854"), and Local 1181, Amalgamated Transit Union ("Local 1181").

Under New York State law, bus companies like CBT must administer a driving skills examination known as the "19A test" to each of their school bus drivers, once when the driver is first hired, and every two years thereafter.  *See* N.Y. Veh. & Traf. Law § 509-g(4).  The relevant statute also allows employers to administer the 19A test more frequently.

The 19A test consists of two parts:  (1) a pre-trip safety inspection of the inside and outside of the bus; and (2) a road test.  Each mistake made by a driver results in a pre-set number of penalty points, and drivers who accumulate thirty points fail the test.  Moreover, some mistakes result in automatic failure of the test.  The parties agree that drivers who fail the 19A test may not operate a school bus for at least five days thereafter, but during that time the driver can receive additional training and schedule a retest, which is administered by a different examiner.  Drivers who fail a second test are disqualified from driving a school bus until they are

3

retested and re-certified by the New York State Department of Motor Vehicles ("DMV") in Albany, New York.

In February 2003, one of CBT's drivers was involved in a fatal bus accident. This incident prompted the company to implement a new policy requiring that any driver involved in a bus accident be given a 19A test whether or not that driver had been tested in the previous two years. Furthermore, any driver involved in a bus accident in the year preceding February 2003 also had to be newly tested.

    2.    Juan Carlos Rodriguez and Teamsters for a Democratic Union

From January 1993 to March 27, 2003, Juan Carlos Rodriguez worked as a CBT bus driver. During the last year of his employment, he worked at the Zerega Avenue bus yard in the Bronx, New York. In early 2002, Rodriguez began to organize discussions with some of his Local 854-represented co-workers regarding his concern that CBT paid lower wages and benefits under Local 854's collective-bargaining agreement ("CBA") than it paid under the Local 1181 CBA. Rodriguez also contacted, sought assistance from, and joined the Teamsters for a Democratic Union ("TDU"), an internal caucus of International Brotherhood of Teamsters members pushing for reform within that union.

Rodriguez became heavily involved in TDU's efforts. In March and April of 2002, he arranged and led four to six TDU meetings, and Rodriguez and others began collecting signatures for a shop steward election scheduled for June 19. Rodriguez campaigned actively for Jona Fleurimont, distributing and posting numerous flyers in support of Fleurimont's candidacy. Much of this activity occurred in full view of CBT management, who accused the activists of "causing trouble" and "trying to hurt" the company. CBT management showed its opposition to

4

Fleurimont's candidacy by removing many of his campaign flyers but leaving the incumbent candidate's flyers untouched.

Fleurimont won the election, and by mid-September 2002, Rodriguez and the other TDU activist employees were openly distributing and posting flyers at the Zerega yard that addressed a range of workplace issues, including wages, work assignments, and an upcoming TDU conference. In response, CBT removed the flyers and replaced them with a notice announcing a new policy barring all postings absent CBT's express consent. On September 30, 2002, Fleurimont and assistant shop steward Jose Guzman received one-day suspensions for posting flyers on the wall of the drivers' break-room. At a grievance hearing over the suspensions, CBT admitted the suspensions were "unjust," issued an apology, and reversed the punishment.

Between December 10, 2002, and January 20, 2003, Rodriguez and others continued openly to distribute flyers at the Zerega yard. The flyers criticized CBT management, praised the leadership of Fleurimont and Guzman, and urged employees to join in TDU's organizing efforts. Rodriguez was also a signatory to an article in TDU's bi-monthly newsletter that accused CBT of "retaliation, sometimes violent" against TDU activists, an apparent reference to a recent incident in which Fleurimont's car had been vandalized.

3.      CBT's Surveillance of Rodriguez

On February 14, 2003, CBT's Bronx safety director, Vito Mecca, followed and videotaped Rodriguez on his morning bus route, the first time Rodriguez had ever been monitored by the company in this way. Rodriguez testified that Mecca told him at the end of the drive that Rodriguez had "done a very good job" but that he had made a "small mistake." Later that day, Rodriguez viewed the tape in Mecca's office, which showed that the right tire of

Rodriguez's bus had touched a line marking a safety zone on the roadway. According to Rodriguez, Mecca told him that he did not consider this to be a serious violation but that "he had orders from the top to penalize [Rodriguez]." Rodriguez was subsequently issued a written warning for a safety violation.

4.    Rodriguez's Failure of Two 19A Tests

On March 19, 2003, CBT summoned Rodriguez to take a 19A test following his morning route. Rodriguez had recently taken a 19A test on October 31, 2002, and thus was not scheduled to take another one before October 31, 2004. He failed the March 19 test and was immediately suspended.

After the test, Rodriguez asked CBT Safety Director Joe Antoci why he had been retested before the usual two-year testing period had expired. Antoci explained that under New York State law, CBT could test an employee as frequently as it considered necessary. When Local 854's Secretary-Treasurer Ann Stankowitz questioned Antoci about the March 19 test, Antoci explained that Rodriguez's February 14, 2003, written safety violation, in combination with an accident Rodriguez had been involved in on June 21, 2002 – four months prior to his last successful 19A test – led to CBT's decision to administer the 19A test off-schedule.

On March 21, 2003, Rodriguez filed a grievance with Local 854 alleging that the March 19 testing was in retaliation for his protected concerted activities in support of TDU. That same day, Rodriguez went with a group of twelve other TDU activist employees to the New York State Department of Education's office to complain about CBT's retaliatory surveillance, work assignments, 19A testing, and their view that Local 854 was effectively controlled by CBT management. Rodriguez personally requested that a representative from the Department of

6

Education witness his upcoming 19A retest.

On March 27, 2003, Rodriguez retook the 19A test, which he again failed. Rodriguez was then ordered to report to Antoci. Rodriguez testified that Antoci told him that he was "disqualified from driving a school bus" and that he "had to take the road test again at the Department of Motor Vehicles" in order to obtain recertification. Rodriguez's co-worker, Raymond Figueroa, who was also tested that afternoon and went with Rodriguez to meet with Antoci, corroborated Rodriguez's account of the conversation. In addition, Stankowitz testified that she had told Rodriguez that failing the 19A test a second time "disqualified" him from driving a school bus, pursuant to New York State regulations.

Rodriguez testified that Antoci called him the next morning – March 28, 2003 – to say that if Rodriguez "would present [him]self at any other bus company," he could "take and pass the road test" and again become "qualified or certified." In response, Rodriguez told Antoci that he planned to call the DMV office in Albany to "find out what [his] situation was." A few days later, Rodriguez called the office and was told by DMV officials that CBT "had let [Rodriguez] go," but the company had not offered the DMV any explanation why.

B.     **Procedural History**

On August 29, 2003, Board Region 2 issued a complaint alleging, *inter alia*, that CBT had discouraged Rodriguez from, and disciplined and discharged Rodriguez in retaliation for, engaging in protected concerted activity, in violation of sections 8(a)(1) and (3) of the Act, 29 U.S.C. § 158(a)(1), (3).[1] On September 3, 2003, CBT filed an answer admitting, *inter alia*, that

_____

[1] Section 8(a)(1) of the Act makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157" of the Act. 29 U.S.C. § 158(a)(1). Section 7 of the Act, 29 U.S.C. § 157, in relevant part, provides:

7

it had disciplined, suspended, and discharged Rodriguez, but denying that it had done so in retaliation for Rodriguez's union activity.

On July 21, 2005, following a fifteen-day trial, the administrative law judge ("ALJ") found, *inter alia*, that CBT had violated section 8(a)(1) of the Act by coercively interrogating and unlawfully following and videotaping Rodriguez in February 2003, and sections 8(a)(1) and (3) by issuing Rodriguez a written safety warning on February 14, 2003. The ALJ found also that CBT had singled out Rodriguez for testing on March 19, 2003, because of his union activities, in violation of sections 8(a)(1) and (3).

Despite CBT's admission that it had "discharged" Rodriguez "[o]n or about" the date of his second failed 19A test, the ALJ found that Rodriguez had merely been "disqualified." Had Rodriguez taken appropriate steps to "regain his ability to drive a school bus," the ALJ concluded that CBT would have rehired him. Further, the ALJ explained that because Rodriguez had a duty to mitigate damages by becoming reemployed as a bus driver, the fact that he made no effort to retake the 19A test made back pay an inappropriate remedy. The ALJ also denied Rodriguez reinstatement because CBT could not legally employ him as a driver while he was unauthorized to operate a bus.

On review, a three-member panel of the Board, *inter alia*, unanimously adopted the ALJ's

---

"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . ."

Section 8(a)(3) of the Act prohibits employer "discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." *Id.* § 158(a)(3).

findings that CBT had committed unfair labor practices through coercive interrogation and videotaped surveillance, and by singling Rodriguez out for testing and issuing him a written safety warning. The Board, however, declined to adopt the ALJ's finding that CBT had only temporarily disqualified Rodriguez following the failure of his second 19A test. On this issue, CBT argued that although it admitted in its answer that it had discharged Rodriguez, the Board was required to invoke Federal Rule of Civil Procedure 15(b) ("Rule 15(b)"), which allows a pleading admission to be implicitly amended. CBT alleged that the failure of the Board's General Counsel (the "General Counsel") to object to testimony regarding Rodriguez's disqualification, combined with the lack of testimony suggesting that Rodriguez was actually discharged, satisfied Rule 15(b)'s requirements.

The Board rejected this reasoning and, citing agency precedent, deemed CBT's admission "a confessionary pleading . . . conclusive upon the party making it." The Board further stated, again under its precedent, that the existence of conflicting record evidence "does not negate the binding effect of the [pleading] admission." The Board then analyzed the discharge under the burden-shifting framework used by the agency in cases of discrimination, concluding that CBT could not prove – as required to rebut the General Counsel's *prima facie* showing of CBT's union animus – that Rodriguez would have been discharged even absent his union activity. While the Board agreed with the ALJ that the results of the 19A tests had not been unfairly manipulated, "[b]y unlawfully singling out Rodriguez for testing, [CBT] orchestrated the circumstances leading to Rodriguez's premature disqualification from driving." In turn, CBT's "basis for the discharge was a direct result of its unlawful actions against him."

As a remedy, the Board, *inter alia*, ordered Rodriguez reinstated to his previous position

9

upon proof that he reestablished his 19A certification within a reasonable time of CBT's reinstatement offer. Because the Board also found that Rodriguez would not have failed the 19A tests or been required to seek recertification, but for CBT's unlawful discrimination, the Board reasoned that Rodriguez's failure to seek immediate recertification did not, as the ALJ suggested, preclude back pay as an additional remedy. The Board acknowledged, however, that even absent CBT's unlawful conduct, Rodriguez would have been required to take a 19A test on October 31, 2004. The Board therefore directed back pay from the date of Rodriguez's discharge, March 27, 2003, to October 31, 2004, the date of his next regularly scheduled 19A test.

On August 31, 2007, the Board filed a petition for enforcement of its Order with this Court, and on March 5, 2008, CBT filed a cross-petition for review of that Order.

On appeal, CBT presents two issues for review: (1) whether substantial evidence supports the Board's conclusion that CBT discharged Rodriguez in violation of sections 8(a)(1) and (3) of the Act; and (2) whether the Board's back pay remedy contravenes the policies of the Act, as well as Board and Circuit precedent.

## DISCUSSION

### A. Discharge

#### 1. Standard of Review

The Board's findings of fact are conclusive if "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e). "We may not 'displace the Board's choice between two fairly conflicting views, even though we would justifiably have made a different choice had the matter been before us de novo.'" *NLRB v. G&T Terminal Packaging Co.*, 246 F.3d 103, 114 (2d Cir. 2001) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488

10

(1951) (brackets omitted)).

We will reverse a factual finding "only . . . if, after looking at the record as a whole, we are left with the impression that no rational trier of fact could reach the conclusion drawn by the Board." *NLRB v. Katz's Delicatessen of Houston St., Inc.*, 80 F.3d 755, 763 (2d Cir. 1996) (internal quotation marks omitted). We will uphold the Board's legal determinations "if not arbitrary and capricious." *Cibao Meat Prods., Inc. v. NLRB*, 547 F.3d 336, 339 (2d Cir. 2008) (internal quotation marks omitted).

2. Analysis

Substantial evidence supports the Board's finding that Rodriguez was discharged and not, as CBT argues again on appeal, merely temporarily disqualified until he passed another 19A test and sought reemployment with the company.[2]

We have held repeatedly that "[f]acts admitted in an answer, as in any pleading, are judicial admissions that bind the defendant throughout [the] litigation." *Gibbs ex rel. Estate of*

---

[2] On appeal to this Court, CBT did not contest, *inter alia*, the Board's findings that it violated sections 8(a)(1) and (3) of the Act by following Rodriguez on his bus route, issuing him a written warning on February 14, 2003, and singling him out for testing on March 19, 2003. Further, CBT did not contest the Board's finding that it violated section 8(a)(1) of the Act by interrogating, threatening, and surveilling Rodriguez and other employees for complaints made to the Department of Education. CBT also does not challenge the Board's remedies related to these violations.

The Board is entitled to summary affirmance of portions of its order identifying or remedying these and all other uncontested violations of the Act, including those relating to CBT employees Jose Estevez, Jona Fleurimont, Jose Guzman, and Raymond Figueroa. *See Torrington Extend-A-Care Employee Ass'n v. NLRB*, 17 F.3d 580, 590 (2d Cir. 1994). To the extent CBT failed to file exceptions to any of the ALJ's findings, we "lack[] jurisdiction to review objections that were not urged before the Board." *Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 666 (1982); *see also KBI Sec. Serv., Inc. v. NLRB*, 91 F.3d 291, 294 (2d Cir. 1996).

*Gibbs v. Cigna Corp.*, 440 F.3d 571, 578 (2d Cir. 2006). This principle is clearly established under Board precedent, *see, e.g.*, *C.P. Assocs., Inc.*, 336 N.L.R.B. 167, 167 (2001) ("[A]n admission is in effect a confessory pleading, and it is conclusive upon the party making it."), and we have previously approved the Board's decision to treat a party's admission as confessionary and conclusive, *see Nat'l Marine Eng'rs Beneficial Ass'n v. NLRB*, 274 F.2d 167, 172 (2d Cir. 1960) ("The issue whether [respondents] were 'labor organizations' was not discussed, for the excellent reason that they had filed an answer admitting they were[,] and the . . . Board . . . took them at their word."); *see also United Steelworkers of Am. v. NLRB*, 983 F.2d 240, 247 (D.C. Cir. 1993) ("The Company admitted the accuracy of this allegation in its answer to the complaint. In so doing, the Company took this issue out of the case." (citation omitted)). We have even suggested that a party's admission in a Board proceeding may carry evidentiary weight in future cases brought before the Board. *See Nat'l Marine Eng'rs Beneficial Ass'n*, 274 F.2d at 172 ("To be sure since the answer was not limited to the particular case, the admission was evidence against [the respondents] elsewhere, and this was not deprived of evidential force by the subsequent unsuccessful attempt to withdraw it.").

CBT admitted in its answer that Rodriguez was discharged following his second 19A test. It argues before this Court, as it did before the Board, that its admission must be deemed amended, pursuant to Rule 15(b), because the record evidence proves that Rodriguez was merely disqualified, not discharged, by CBT, and the Board's General Counsel failed to object to, and even personally entered, such evidence.[3] *See Ostano Commerzanstalt v. Telewide Sys., Inc.*, 880

---

[3] Rule 15(b)(2) provides: "When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings. A party may move—at any time, even after judgment—to amend the pleadings to conform them

12

F.2d 642, 646 (2d Cir. 1989) ("Rule 15(b) is 'mandatory, not merely permissive,' in requiring that issues that are tried, though not raised in the pleadings, be treated as if they were raised in the pleadings." (quoting *SEC v. Rapp*, 304 F.2d 786, 790 (2d Cir. 1962))).

CBT, however, misapprehends the Board's obligation to apply the Federal Rules of Civil Procedure. With respect to the standards and procedures to be applied at hearings, section 101.10(a) of the Board's Rules and Regulations states that: "The rules of evidence applicable in the district courts of the United States under the Rules of Civil Procedure adopted by the Supreme Court are, so far as practicable, controlling." 29 C.F.R. § 101.10(a); *see also* 29 U.S.C. § 160(b). We have interpreted this Rule to mean that the Board's procedures are to be controlled by the Federal Rules of Civil Procedure "'as far as practicable.'" *NLRB v. Local 138, Int'l Union of Operating Eng'rs*, 380 F.2d 244, 253 (2d Cir. 1967) (quoting *Frito Co., W. Div. v. NLRB*, 330 F.2d 458, 465 (9th Cir. 1964)).

In this context, the Board has opted, through its Rules and Regulations, to make a number of allowances for parties to amend pleadings prior to, during, and after hearings. Section 102.23 of the Board's Rules and Regulations states that a respondent may amend his or her answer (1) "at any time prior to the hearing," (2) "[d]uring the hearing or subsequent thereto . . . where the complaint has been amended," or (3) "upon motion." 29 C.F.R. § 102.23. Section 102.24(a) states that pre-hearing motions "shall be filed in writing"; however, motions, including motions to amend an answer, may be made "at the hearing . . . [if] made in writing . . . or stated orally on the record." *Id.* § 102.24(a). "All motions filed subsequent to the hearing, but before the transfer of the case to the Board," must be in writing. *Id.*

---

to the evidence and to raise an unpleaded issue." Fed. R. Civ. P. 15(b)(2).

Here, CBT did not move to amend its answer before, during, or after the ALJ proceeding. Though it urges us to reject the Board's decision to decline to consider CBT's answer implicitly amended pursuant to Rule 15(b), the Board has consistently limited its acceptance of post-hearing amendments to amendments predicated upon a written motion. *See, e.g.*, *C.P. Assocs., Inc.*, 336 N.L.R.B. at 167 ("Nor do we find that the introduction of potentially conflicting evidence negates the binding effect of the admission. Both the Board and the courts have held that admissions contained in pleadings are binding even where the admitting party later produces contrary evidence."); *Boydston Elec., Inc.*, 331 N.L.R.B. 1450, 1451 (2000) ("[T]he Respondent's introduction of evidence potentially in conflict with its admission [in its answer] does not negate the binding effect of the admission.").

The Board's procedures and practices with respect to pleading amendments deserve deference. *See KBI Sec. Serv., Inc.*, 91 F.3d at 295 ("The Board is vested with broad discretion in interpreting and applying its own rules." (citing *Am. Hosp. Ass'n v. NLRB*, 499 U.S. 606, 613 (1991))). We will "set aside the Board's construction of its own rules only where the Board has acted in a fashion so arbitrary as to defeat justice," *id.* (internal quotation marks omitted), and in the sole prior case of which we are aware in which we compelled the Board to accept an implied amendment under Rule 15(b), the appellant had properly moved to amend its answer, but the Board had denied the motion, *see Local 138, Int'l Union of Operating Eng'rs*, 380 F.2d at 253–54.

Given CBT's failure to avail itself of the various opportunities provided and required by the Board's Rules and Regulations to amend its answer through a written or oral motion, we conclude that the Board did not act arbitrarily in holding CBT to the Board's procedural

14

requirements. Substantial evidence therefore supports the Board's conclusion that CBT

discharged Rodriguez instead of merely disqualifying him.[4] As CBT does not dispute that it

unlawfully singled Rodriguez out for testing, we additionally affirm the Board's conclusion that

the discharge was a violation of sections 8(a)(1) and (3) of the Act.

**B.     Back Pay**

1.      Standard of Review

The Board's "unique expertise in labor disputes" leads us to entrust the agency with

"broad discretionary powers to fashion remedies for violations of the Act." *NLRB v. Ferguson*

*Elec. Co.*, 242 F.3d 426, 431 (2d Cir. 2001). We therefore grant the Board's "choice of remedy

. . . special respect." *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 612 n.32 (1969). Where a

remedial provision in a Board's order is challenged, we will not disturb it "unless it can be shown

that the order is a patent attempt to achieve ends other than those which can fairly be said to

effectuate the policies of the Act." *Va. Elec. & Power Co. v. NLRB*, 319 U.S. 533, 540 (1943);

*see also* 29 U.S.C. § 160(c) (empowering the Board to issue an order requiring a person who has

committed an unfair labor practice "to cease and desist from such unfair labor practice, and to

take such affirmative action including reinstatement of employees with or without back pay, as

---

[4] We note that we are not convinced that, as CBT asserts, the record is entirely devoid of evidence regarding Rodriguez's discharge. For instance, Rodriguez testified that when he called the Department of Motor Vehicles in Albany to ascertain his status with CBT, he was "informed . . . that the company had let [him] go." We also note that, contrary to CBT's suggestion, the fact that the General Counsel asked questions or failed to object to testimony about the events surrounding Rodriguez's disqualification does not, on its face, constitute evidence that Rodriguez was not also *discharged* by the company. *See Grand Light & Supply Co. v. Honeywell, Inc.*, 771 F.2d 672, 680 (2d Cir. 1985) ("The purpose of Rule 15(b) is to allow the pleadings to conform to issues actually tried, not to extend the pleadings to introduce issues inferentially suggested by incidental evidence in the record." (internal quotation marks omitted)).

will effectuate the policies of [the Act]"); *KBI Sec. Serv., Inc.*, 91 F.3d at 295.

2.      Analysis

As already noted, the Board ordered, *inter alia*, that Rodriguez be made whole through back pay computed from the date of his unlawful discharge to the date of his next regularly scheduled 19A test.  CBT broadly contends that this back pay remedy fails to effectuate the policies of the Act, even if Rodriguez was unlawfully fired, because it requires CBT to pay Rodriguez during a period in which he was not legally authorized to be employed as a bus driver. CBT additionally argues that the facts and reasoning set forth by our decision in *NLRB v. Future Ambulette, Inc.*, 903 F.2d 140 (2d Cir. 1990), and the Board's decision in *Anheuser-Busch, Inc.*, 351 N.L.R.B. No. 40 (Sept. 29, 2007), preclude a back pay remedy in this case as a matter of law. We disagree.

"The finding of an unfair labor practice and discriminatory discharge is presumptive proof that some back pay is owed by the employer." *NLRB v. Mastro Plastics Corp.*, 354 F.2d 170, 178 (2d Cir. 1965).  Furthermore, where a worker has been the victim of unlawful discrimination under the Act, as is the case here, the Board is empowered to grant the amount of "gross backpay" that will "restore the situation as nearly as possible, to that which would have obtained but for the illegal discrimination." *NLRB v. Coca-Cola Bottling Co. of Buffalo, Inc.*, 191 F.3d 316, 325 (2d Cir. 1999) (internal quotation marks omitted); *see also Franks v. Bowman Transp. Co.*, 424 U.S. 747, 769 (1976) ("The task of the NLRB in applying § 10(c) is 'to take measures designed to recreate the conditions and relationships that would have been had there been no unfair labor practice.'" (quoting *Carpenters v. NLRB*, 365 U.S. 651, 657 (1961) (Harlan, *J.*, concurring))).  A back pay award is therefore "an approximation, necessitated by the

16

employer's wrongful conduct," which attempts to make a victim of discrimination as close to economically whole as possible. *NLRB v. Aeronautical Indus. Dist. Lodge No. 91*, 934 F.2d 1288, 1297 (2d Cir. 1991) (internal quotation marks omitted); *see also Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 194 (1941) (stating that "the effectuation of [the Act's] policy generally requires . . . compensation for the loss of wages. . . . Only thus can there be a restoration of the situation, as nearly as possible, to that which would have obtained but for the illegal discrimination.").

In Rodriguez's case, the Board's back pay remedy draws directly from these principles:

> But for the discrimination, Rodriguez would not have been required to take the tests on March 19 and 27. He therefore would not have failed those tests. And, but for these failures, there would have been no need to seek a new certification. . . . We therefore find that the appropriate remedy for this 8(a)(1) violation, and the additional 8(a)(1) and (3) discharge violation we have found, includes back pay.

The remedy is crafted to consider Rodriguez's employment status had he not been singled out for off-schedule testing. Absent the unlawful targeting, Rodriguez presumably would have remained licensed at least between March 27, 2003, the date of the second failed test, and October 31, 2004, the date of his next regularly-scheduled test. He therefore would have retained his salary for that approximately nineteen-month period. This is the very time-frame for which the Board awarded Rodriguez back pay, thus restoring, "as nearly as possible," the economic conditions that "would have obtained but for the illegal discrimination." *Coca-Cola Bottling Co.*, 191 F.3d at 325.

We hold that the policies underpinning the Board's authority to redress discrimination through back pay are not contravened simply because this pay period covers time for which

17

Rodriguez was not licensed to drive a bus. Rather, the remedy effectuates those policies by restoring Rodriguez to the economic status quo absent CBT's wrongful acts.[5] *Cf. Future Ambulette*, 903 F.2d at 145 (modifying a remedial order to grant an unlicensed ambulance driver back pay from the day he was unlawfully fired until the "earlier of his actual reinstatement, his refusal of reinstatement, or his failure to timely present his driver's license"); *NLRB v. Fugazy Cont'l Corp.*, 817 F.2d 979, 982 (2d Cir. 1987) ("Remedies under the Act are designed to vindicate the public policy of the statute by making the employees whole for losses suffered on account of an unfair labor practice and to guard against rewarding an employer for his own misconduct." (citations and internal quotation marks omitted)).

The cases cited by CBT do not compel a different result. For example, in *Future Ambulette*, the Board ordered back pay to accrue from the date an unlicensed van driver was unlawfully discharged until the earliest of three possible future dates: (1) once the driver had first obtained a valid license, the date the company then offered the driver reinstatement to his former driving position; (2) if the driver failed to obtain a valid license within a reasonable time, the date the company offered the driver a "substantially equivalent position"; or (3) if a "substantially equivalent position" did not exist at the company, the date the driver successfully obtained "substantially equivalent employment elsewhere." *Future Ambulette*, 903 F.2d at 144–45. We modified the order because its "open-ended" nature – which required back pay to "accrue so long as [the driver was] out of work" – both "encourage[d] illegal hiring" by pressuring the company to rehire the driver even if he lacked a license, and empowered the driver

---

[5] We note that the Board properly dealt with the fact that it is illegal under New York State law for Rodriguez to work at CBT without a license by conditioning reinstatement upon proof that Rodriguez had reestablished his 19A certification.

18

to decide "whether to seek reinstatement and whether to seek equivalent employment elsewhere" while back pay amassed indefinitely. *Id.* at 145. We also criticized the order's implication that it would be reasonable to require the company to consider hiring the driver for a position the driver had never held. *Id.*

The back pay remedy in this case suffers from none of these problems. As an initial matter, the back pay period is finite, not open-ended; it expressly runs from March 27, 2003, until October 31, 2004, a range crafted only to restore to Rodriguez the income he would have received absent the illegal activity. Nor does the back pay remedy pressure CBT to illegally re-hire Rodriguez – especially as the company conceded at oral argument that it had yet to offer Rodriguez reinstatement, in violation of the Board's Order.[6] Furthermore, the finite period of the remedy ensures that CBT's back pay liability is tightly controlled, regardless of whether Rodriguez opts to retake the 19A test, applies to work at another bus company, or enters a new line of work entirely. Finally, because the Order does not require CBT to offer Rodriguez a "substantially equivalent position" with the company, it need not place Rodriguez in a job other than the one he had held for over ten years.

CBT alternatively relies on *Anheuser-Busch, Inc.*, 351 N.L.R.B. No. 40 (Sept. 29, 2007), to contend that the Board's back pay Order must be rejected. In *Anheuser-Busch*, the Board held that it lacked the authority, pursuant to section 10(c) of the Act, to order remedial back pay to employees disciplined "for cause," even if the employees' misconduct was detected through the employer's "unilaterally and unlawfully implemented means." *Id.* at *4; *see* 29 U.S.C. § 160(c)

---

[6] The Board's Order states: "Therefore, we shall order the Respondent Employer to offer Rodriguez reinstatement contingent upon his demonstrating that he reestablished his 19A certification within a reasonable time *of the offer*." (emphasis added).

("No order of the Board shall require . . . the payment . . . of any back pay, if such individual was suspended or discharged for cause."). Thus, employees discharged for work-site drug use were not entitled to back pay even though the employer discovered the misconduct only through hidden video cameras installed without first giving the union prior notice and an opportunity to bargain, in violation of section 8(a)(5) of the Act.[7] *Anheuser-Busch, Inc.*, 351 N.L.R.B. at *2.

*Anheuser-Busch*, however, is easily distinguishable from this case. First, in *Anheuser-Busch* there was no suggestion that the employees were targeted because of their participation in protected concerted activities. *Id.* at *6. Rather, the employees were terminated "for cause" because they had engaged in "serious, admitted violations of lawfully established work rules." *Id.* at *7. By contrast, the Board explained that "[a] termination of employment that is motivated by protected activity is unlawful under Section 8(a)(1) and/or (3), and is not 'for cause.'" *Id.* In this case, CBT concedes that union animus motivated its decision to single Rodriguez out for testing. Thus, his failure of the 19A tests was not a "for cause" reason for discharge.

Second, even assuming *arguendo* that Rodriguez's two failed tests constituted "for cause" misconduct, *Anheuser-Busch* nonetheless is inapposite. In that case, the employees' "for cause" misconduct – workplace drug use – was entirely independent from the employer's illegal installation of cameras. Here, however, CBT actually *created* the allegedly "for cause" basis for discharge by unlawfully targeting Rodriguez for engaging in protected union activity. It is this nexus that distinguishes the instant case from *Anheuser-Busch*.

In sum, our consideration of the policies underlying the Board's authority to issue back

---

[7] Section 8(a)(5) makes it "an unfair labor practice for an employer . . . to refuse to bargain collectively with the representatives of [its] employees." 29 U.S.C. § 158(a)(5).

pay to redress discrimination suggests that the Board's remedy was appropriate, even though CBT must pay Rodriguez for a period in which he was not licensed to operate a bus. Restoring the economic status quo upset by violations of the Act is the very purpose of the back pay remedy, *see Phelps Dodge Corp.*, 313 U.S. at 194, and allowing CBT to escape the financial consequences of its discriminatory acts because those acts additionally caused Rodriguez to lose his license would not further this policy.

## CONCLUSION

For the foregoing reasons, the Board's application for enforcement of its Order is GRANTED. CBT's petition for review of the Board's Order is DENIED.